**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

MAUREEN RATTRAY, LISA
LAMBERT, and LORI MATHES,

      Plaintiffs,

vs.

WOODBURY COUNTY, IOWA,

      Defendant.

No. C 07-4014-MWB
(No. C 08-4008-MWB)
(No. C 08-4032-MWB)

**MEMORANDUM OPINION AND
ORDER REGARDING DEFENDANT'S
MOTIONS FOR RECONSIDERATION
AND FOR SUMMARY JUDGMENT**

_____

**TABLE OF CONTENTS**

I.    **INTRODUCTION**............................................................................ 3
    A.   *Factual Background* ............................................................... 3
    B.   *Procedural Background* .......................................................... 5

II.   **LEGAL ANALYSIS** ...................................................................... 7
    A.   **Reconsideration Of Summary Judgment In Rattray's Favor**............... 8
        1.   Arguments of the parties.................................................. 8
        2.   Reconsideration standards.............................................. 10
        3.   Analysis ................................................................... 13
            a.   *The basis for summary judgment in Rattray's case* ....... 13
            b.   *The decision in Florence* ...................................... 16
            c.   *The effect of Florence on the controlling legal rule* ...... 23
    B.   **Consideration Of Summary Judgment In The County's Favor**.......... 29
        1.   Arguments of the parties................................................ 30
        2.   Summary judgment standards ......................................... 32
        3.   "No reasonable suspicion" claims .................................... 33
        4.   "Manner" claims........................................................ 38
            a.   *Rattray's "manner" claim*..................................... 39
            b.   *Mathes's "manner" claim*..................................... 41
            c.   *Lambert's "manner" claim* .................................... 43
        5.   Summary................................................................. 45

      *C.*       *Reconsolidation Of Trials* ...................................................... *45*
      *D.*       *Certification For Interlocutory Appeal* ..................................... *46*
              *1.*      *Certification pursuant to Rule 54(b)* ................................. *46*
              *2.*      *Certification pursuant to 28 U.S.C. § 1292(b)* ..................... *50*

*III.*    **CONCLUSION** .............................................................................. *52*

In these consolidated cases, the plaintiffs assert that their Fourth Amendment rights were violated when they were strip searched without reasonable suspicion that they were carrying contraband, upon being booked into the county jail.  These cases are back before me on the defendant county's motions for reconsideration of a prior order granting summary judgment in one plaintiff's favor on her claim and seeking summary judgment in the county's favor on all of the plaintiffs' claims in light of the Supreme Court's decision in *Florence v. Board of Chosen Freeholders of the County of Burlington*, ___ U.S. ___, 132 S. Ct. 1510 (2012).  In *Florence*, the Supreme Court held that every detainee, even one held on a non-indictable offense, who will be admitted to the jail's "general population" may be required to undergo a close visual inspection while undressed without reasonable suspicion that the detainee is hiding contraband.  The county argues that, by reasonable extension, *Florence* bars the claims of the plaintiffs, because the undisputed facts show that they were likely to have substantial contact with other detainees during their temporary detention, even if they were not admitted to "general population" *per se*.  The plaintiffs argue that *Florence* is inapplicable, because none of the plaintiffs were admitted to "general population" in the jail, so that circuit precedent requiring reasonable suspicion to strip search detainees still prevails in their circumstances.

# I.    INTRODUCTION

## A.    Factual Background

As is my usual practice, I set forth here only those facts, disputed and undisputed, sufficient to put in context the parties' arguments concerning the defendant's motions for summary judgment.  Unless otherwise indicated, the facts recited here are undisputed, at least for purposes of summary judgment.  I will discuss additional factual allegations, and the extent to which they are or are not disputed or material, if necessary, in my legal analysis.

In the early morning hours of August 19, 2006, Maureen Rattray, the original plaintiff in this action, was arrested on a serious misdemeanor charge of operating while intoxicated – first offense, in violation of IOWA CODE § 321J.2.  She was taken to the Woodbury County Jail, where she was strip searched in accordance with a then-existing jail policy that required all persons booked on charges of a serious misdemeanor or greater to be strip searched.  The strip search was not based on any reasonable suspicion analysis of whether Rattray might be carrying contraband.  Rattray contends that the strip search involved more than a visual body inspection, as it included improper touching and other aggravating circumstances that were not part of the jail policy.  After the strip search, Rattray was escorted to a temporary holding cell under what she also argues were aggravating circumstances.  At no time did Rattray share a cell with any other detainee, nor was she ever admitted to the jail's "general population."  This was so, because detainees were not admitted to the jail's "general population" during the first twenty-four hours of their detention.  On the morning of August 19, 2006, several hours after her arrest, Rattray was shackled with other detainees and escorted to court for an initial appearance and arraignment before a magistrate judge.  The trip to court was Rattray's only interaction with other detainees

during her detention.  Rattray was released from jail on August 19, 2006, soon after her arraignment.

Plaintiffs Lisa Lambert and Lori Mathes, the plaintiffs in additional actions consolidated with Rattray's, were also arrested on serious misdemeanor charges. Lambert was arrested on March 17, 2007, on a charge listed on her booking sheet as serious domestic assault.  Mathes was arrested on May 7, 2007, on a charge of possession of marijuana.  Like Rattray, both were taken to the Woodbury County Jail for booking and both were strip searched pursuant to the then-existing jail policy. Neither strip search was based on any reasonable suspicion analysis of whether either might be carrying contraband.  The parties dispute whether Lambert and Mathes were subjected only to visual body inspections, or to visual cavity searches, and other circumstances of the strip searches.  During the search of Lambert, officers discovered a small knife.  Lambert and Mathes were taken to temporary holding cells after the searches.

The County contends, and the plaintiffs dispute, that detainees may potentially be housed with other detainees upon their initial admission to the jail; that it is not uncommon for detainees to be "doubled up" in a holding cell, depending on the number of arrests that have occurred during the period of detention; and that the need to house detainees with other detainees can change rapidly, because of the limited number of holding cells at the jail.  Like Rattray, Mathes never shared a holding cell with another detainee, and neither Lambert nor Mathes was ever admitted to the "general population" at the jail, because neither was held for more than twenty-four hours. However, in their briefing, the County contends, and Lambert admits, that she shared a holding cell with other detainees (at least two, and possibly "several") during the night. The parties agree that, like Rattray, Mathes was handcuffed with other detainees (in Mathes's case, eight other detainees) when she was transported to court for her initial

4

appearance. The parties have not indicated in their respective statements of fact whether Lambert was handcuffed with other detainees for transportation to court for her initial appearance. Like Rattray, Lambert and Mathes were both released shortly after their arraignments—in Lambert's case, the day after her arrest, and in Mathes's case, the same day as her arrest.

### B.    *Procedural Background*

The procedural history for this case is long and convoluted. Some of it has been addressed in prior published rulings. *See Rattray v. Woodbury Cnty., Iowa*, 253 F.R.D. 444 (N.D. Iowa 2008) (denying class certification after consolidation of separate actions by plaintiffs Rattray, Mathes, and Lambert, and assertion of class claims), *aff'd*, 614 F.3d 831 (8th Cir. 2010); *Rattray v. Woodbury Cnty., Iowa*, 754 F. Supp. 2d 1023 (N.D. Iowa 2010) (granting in part and denying in part the plaintiffs' motion for summary judgment). Suffice it to say, for present purposes, that the plaintiffs asserted claims that their strip searches without reasonable suspicion violated the Fourth and Fourteenth Amendments to the United States Constitution, and that I declined to certify the action as a class action on behalf of a class of similarly-situated persons. However, I did grant summary judgment in plaintiff Rattray's favor on her claim of liability for violating her rights, and severed her damages claim for a separate trial before the trial of Lambert's and Mathes's liability and damages claims.

In the midst of preparations for Rattray's damages trial, the parties agreed to dismissal of the claims against the individual defendants, so that Rattray's claims proceeded to trial only against the County. A jury awarded Rattray substantial damages on her claim on January 20, 2011, *see* Verdict Form (docket no. 132); Amended Verdict Form (docket no. 133), but, owing to seriously problematic circumstances

surrounding the jury's damages awards, I granted the County's Motion For New Trial (docket no. 144) by Order (docket no. 147), filed March 7, 2011.

This case was then stayed during the pendency, before the Supreme Court, of *Florence v. Board of Chosen Freeholders of the County of Burlington*, 621 F.3d 296 (3d Cir. 2011), *petition for cert. filed*, 2011 WL 220710 (Jan. 19, 2011), *cert. granted*, 2011 WL 202772 (April 4, 2011), *aff'd*, ___ U.S. ___, 132 S. Ct. 1510 (2012).  I entered an Order (docket no. 164) on May 2, 2012, lifting the stay and directing the parties to file a proposed Scheduling Order establishing deadlines and trial readiness dates for a retrial on Rattray's damages claim and a trial on Lambert's and Mathes's liability and damages claims that would provide for the prompt and efficient disposition in each case.  By Order (docket no. 173), dated July 3, 2012, Rattray's damages claim was set for retrial on March 11, 2013, and by Order (Case No. C 08-4008, docket no. 17, and Case No. C 08-4032-MWB, docket no. 14), dated July 3, 2012, Lambert's and Mathes's liability and damages claims were set for trial on April 22, 2013.[1]

On September 28, 2012, the new deadline for dispositive motions, the County filed its Motion To Reconsider Ruling On Rattray's Motion For Partial Summary Judgment And [Its] Motion For Partial Summary Judgment (docket no. 176) and also filed its Motion For Summary Judgment Regarding Mathes And Lambert (docket no. 177).   In those Motions, the County argues that the Supreme Court's decision in *Florence* not only requires that I reconsider my order granting summary judgment on liability in favor of Rattray, but that I now grant summary judgment in the County's favor on all three plaintiffs' claims that a strip search of detainees without reasonable

---

[1] Although the filing of the orders setting trial in the original separate cases appeared to sever the consolidated cases, there has been no order severing the cases, and Case No. C 07-4014-MWB, Rattray's case, remains the lead case for the consolidated actions.

suspicion violates the Fourth and Fourteenth Amendment.  Rattray filed her Resistance (docket no. 181) to the County's Motion, as to her, on October 31, 2012, and Lambert and Mathes filed their Resistance (docket no. 182) to the County's Motion, as to them, on November 1, 2012.  The County filed Replies (docket nos. 183 and 184) in further support of its Motions on November 7, 2012.

The County requested oral arguments on its Motions.  Because my crowded schedule has not permitted the timely scheduling of such oral arguments, and I find that the parties have thoroughly briefed the issues, I will consider the Motions fully submitted on the written submissions.

## II.     LEGAL ANALYSIS

Although the central issue in both of the County's Motions is the impact of *Florence*, that issue is raised in somewhat different procedural contexts as to Rattray, on the one hand, and as to Lambert and Mathes, on the other.  Specifically, the County seeks reconsideration of my prior summary judgment ruling in Rattray's favor on her "no reasonable suspicion" strip-search claim, but there is no summary judgment ruling in favor of Lambert and Mathes to set aside.  The County also seeks summary judgment or partial summary judgment in its favor on all three plaintiffs' strip-search claims.  In a footnote in its brief supporting its motion as to Rattray, the County acknowledges that a factual question exists regarding the "manner" in which Rattray's strip search was conducted, not simply that a strip search was done with "no reasonable suspicion."  Consequently, the County explains that it is only seeking partial summary judgment on Rattray's claims.  There is no such limitation on the County's Motion For Summary Judgment on Lambert's and Mathes's claims.  Nevertheless, I read Lambert's and Mathes's Resistance to suggest that they believe that they also have both "no reasonable suspicion" and "manner" strip-search claims.  There is, thus, considerable

7

overlap of the issues as to whether or not the County is entitled to summary judgment in its favor on any of the plaintiffs' claims. Therefore, I will first consider, separately, whether the *Florence* decision requires me to reconsider and withdraw my grant of summary judgment in favor of Rattray on her "no reasonable suspicion" strip-search claim. I will then consider whether the County is entitled to summary judgment in its favor on one or more of plaintiffs' strip-search claims.

### A.    Reconsideration Of Summary Judgment In Rattray's Favor

#### 1.    Arguments of the parties

The County argues that, while there was a split in the circuits prior to *Florence* as to the constitutionality of a strip search of detainees without reasonable suspicion, the Supreme Court determined in *Florence* that the Fourth Amendment does not require reasonable suspicion before a detainee is strip searched for non-indictable offenses. Thus, the County argues, no constitutional violation occurs simply because a strip search of a detainee was conducted absent reasonable suspicion. The County points out that I previously granted summary judgment on liability in Rattray's favor precisely on the ground that she was strip searched without reasonable suspicion, so that it is no longer appropriate to let that ruling stand. The County argues that this is so, even though the Supreme Court did not specifically address cases where a detainee might be detained in a holding area and not admitted into "general population" of a jail, because the Court's rationale concerning the risks of failing to discover contraband should apply to detention situations in which detainees have substantial contact with other detainees. The County also argues that Rattray cannot generate any genuine issue of material fact that the strip-search policy was an unnecessary or unjustified response to problems of jail security. The County argues that this is so, because detainees at the County Jail are

potentially housed with other detainees upon initial admission into the jail, as circumstances may require "doubling up" in holding cells, and after placement in temporary holding, detainees are not searched again before being shackled with other detainees and transported to the courtroom for their initial appearances.

Rattray argues that *Florence* simply does not apply here, so that there has been no intervening change in controlling law. Rattray reads the Supreme Court's decision to limit the issue before the Court to be whether detainees *who will be admitted to the general population of a jail* may be required to undergo a close visual inspection while undressed. She also reads the concurring opinions to painstakingly limit the Court's holding to detainees admitted to "general population" and to avoid a rule barring a reasonable suspicion requirement in other circumstances. She contends that there is no dispute that at no time was she a detainee who would be admitted to the "general population," because detainees at the County Jail were not admitted to "general population" during their first twenty-four hours of detention, and she was never required to share a holding cell. Indeed, she asserts baldly that she did not have substantial contact with other detainees. She also argues that her strip search was more invasive than the visual body inspection at issue in *Florence*. Thus, she argues that the facts in her case fall squarely within the particularized series of cases to which the Supreme Court unequivocally said its holding in *Florence* did not extend. Therefore, she argues that there was no intervening change in controlling law and that my prior grant of summary judgment in her favor was not clearly or manifestly erroneous.[2]

In reply, the County asserts that, contrary to Rattray's reading, the main issue in *Florence* was whether undoubted security imperatives involved in jail supervision override the assertion that some detainees must be exempt from the more invasive

---

[2] Rattray's arguments about the scope and impact of *Florence* are echoed by the other plaintiffs.

search procedures at issue, that is, strip searches without touching by jail officers, absent reasonable suspicion of a concealed weapon or other contraband. The County argues that, with that issue foremost, the Supreme Court concluded that the detection of contraband was so critical to jail security that the imposition of a complicated constitutional scheme prior to conducting a strip search of detainees would be unmanageable. The County argues that Rattray has failed to generate a genuine issue of material fact that the strip search was an exaggerated response to jail security issues. The County also argues that Rattray mistakenly focuses on the "general population" language in *Florence*, instead of on the "substantial contact" with other detainees rationale for that decision.

### 2.    *Reconsideration standards*

In *Kirt v. Fashion Bug # 3252, Inc.*, 495 F. Supp. 2d 957 (N.D. Iowa 2007), I addressed a district court's authority to reconsider an order granting summary judgment, as follows:

> This court has previously found that Rule 54(b) of the Federal Rules of Civil Procedure provides authority for a court to reconsider any interlocutory order, including a prior ruling on a motion for summary judgment. *Doctor John's, Inc. v. City of Sioux City, Iowa*, 467 F.Supp.2d 925, 931 (N.D. Iowa 2006); *Wells' Dairy, Inc. v. Travelers Indemnity Company of Illinois*, 336 F.Supp.2d 906, 909 (N.D. Iowa 2004) (citing cases). Specifically, Rule 54(b) provides that, unless the court certifies the order for interlocutory appeal, "any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision *is subject to revision at any time before the entry of judgment* adjudicating all the claims and the rights and liabilities of all the parties." Fed.R.Civ.P. 54(b) (emphasis added). Moreover, this court has repeatedly held that it has the inherent power to reconsider

> and revise any interlocutory order, such as a summary judgment ruling, up until the time that a final judgment is entered. *Wells' Dairy, Inc.*, 336 F.Supp.2d at 909 (citing *Kaydon Acquisition Corp. v. Custum Mfg., Inc.*, 317 F.Supp.2d 896, 903 (N.D. Iowa 2004); *Helm Financial Corp. v. Iowa N. Ry. Co.*, 214 F.Supp.2d 934, 999 (N.D. Iowa 2002); and *Longstreth v. Copple*, 189 F.R.D. 401, 403 (N.D. Iowa 1999)).

*Kirt*, 495 F. Supp. 2d at 964-65. Rattray does not dispute my authority to reconsider the order granting summary judgment in her favor on her "no reasonable suspicion" strip-search claim, and I reiterate my conclusion in *Kirt* and other decisions that I have such authority.

In *Kirt*, I also considered the standards applicable to reconsideration of a summary judgment ruling pursuant to Rule 54(b), as follows:

> This court has also noted, "The exact standard applicable to the granting of a motion under Rule 54(b) is not clear, though it is typically held to be less exacting than would be [applicable to] a motion under Federal Rule of Civil Procedure 59(e), which is in turn less exacting than the standards enunciated in Federal Rule of Civil Procedure 60(b)." [*Wells' Dairy*, 336 F. Supp. 2d at 909.] Although the standards for reconsideration of interlocutory orders may be less "exacting" than the standards for reconsideration of final orders under Rules 59(e) and 60(b), this court has nevertheless held that it should look to the general principles under Rules 59(e) and 60(b) for guidance when reconsidering a summary judgment ruling pursuant to Rule 54(b). *Id.* (citing *Bragg v. Robertson*, 183 F.R.D. 494, 496 (S.D. W. Va. 1998)).

*Kirt*, 495 F. Supp. 2d at 965.

Looking for such guidance in *Kirt*, I noted that, "[u]nder Rule 59(e), a judgment may be amended to correct 'clearly' or 'manifestly' erroneous findings of fact or conclusions of law." *Id.* I now note that Rule 60(b)(5) also provides relief "from a

*final* judgment," *inter alia*, if "applying it prospectively is no longer equitable." FED. R. CIV. P. 60(b)(5) (emphasis added). The Eighth Circuit Court of Appeals has explained that "[w]hen *prospective relief* is at issue, a change in decisional law provides sufficient justification for Rule 60(b)(5) relief," *Prudential Ins. Co. of Am. v. National Park Med. Ctr., Inc.*, 413 F.3d 897, 903 (8th Cir. 2005) (emphasis added), but that court has also explained that "'[a] change in the law *following a judgment* does not merit relief under Rule 60(b)(5),'" *In re Racing Servs., Inc.*, 571 F.3d 729, 732 (8th Cir. 2009) (emphasis added) (quoting 12 MOORE'S FEDERAL PRACTICE at § 60.46[2]); *see also Kansas Public Employees Retirement Sys. v. Reimer & Kroger Assocs., Inc.*, 194 F.3d 922, 925 (8th Cir. 1999) (concluding that a change in the law that would have governed the dispute, had the dispute not already been decided, is not by itself an "extraordinary" or "exceptional" circumstance warranting relief under Rule 60(b)(6)). Even in the circumstance of a final judgment providing prospective relief, such as a consent decree for injunctive relief, there must be an intervening controlling decision that actually changes the law in a way applicable to the case. *Compare White v. National Football League*, 585 F.3d 1129, 1136-37 (8th Cir. 2009) (concluding that an intervening Supreme Court decision addressed a different issue, so that it was inapposite, and its rationale also did not apply to the context of the litigation before the court), *with Prudential Ins. Co.*, 413 F.3d at 905 (concluding that "not only was there a substantial subsequent change in the law but also the movant's original decision not to file a writ of certiorari was reasonable because the Supreme Court had recently declined to consider similar issues in two cases").

I believe that the Rule 60(b)(5) "change in the law" standard for a final order granting prospective relief provides guidance for reconsideration pursuant to Rule 54(b) of an interlocutory order granting summary judgment, because continuing to rely on superseded law in a pending case, as in a case involving prospective relief, "is no

longer equitable." *Cf.* FED. R. CIV. P. 60(b)(5). Although the Eighth Circuit Court of Appeals has not expressly done so, other Circuit Courts of Appeals have expressly recognized that reconsidering the grant or denial of summary judgment in light of an intervening change in controlling law is appropriate, pursuant to either Rule 59 or Rule 60. *See, e.g., Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 551–52 (6th Cir.2012) (citing *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010), and Rule 59); *McQuillion v. Duncan*, 342 F.3d 1012, 1014 (9th Cir. 2003) (concluding that reconsideration of an order granting summary judgment pursuant to a 59(e) motion requires new evidence, a change in the law, or a clearly erroneous decision); *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 569 (11th Cir. 1990) (noting that a district court may reconsider a denial of a motion for summary judgment pursuant to Rule 60(b) when there has been "an intervening change in controlling law") (citation omitted).

Therefore, I conclude that an intervening change in controlling law is sufficient to reconsider and set aside an interlocutory order granting summary judgment.

### 3.    *Analysis*

#### a.         *The basis for summary judgment in Rattray's case*

To determine whether or not *Florence* is a change in controlling law, I must first review the basis on which I granted summary judgment in favor of Rattray on her unlawful strip-search claim. In their summary judgment motions, the plaintiffs sought summary judgment on four issues:

> (1) that the defendants' strip search policy was facially unconstitutional; (2) that the individual defendants, the sheriff and assistant chief deputy sheriff, are not entitled to qualified immunity in this case; (3) that the defendants conducted the strip searches in question pursuant to the defendant county's unconstitutional "blanket" strip search policy and, therefore, have the burden to establish *post hoc*

> reasonable suspicion for each search to avoid liability; and
> (4) that the defendants have failed to generate genuine issues
> of material fact concerning reasonable suspicion, even *post
> hoc*, to support the strip searches of the plaintiffs.

*Rattray*, 754 F. Supp. 2d at 1025-26.   However, I denied the plaintiffs' request for summary judgment on the first and third questions, "as moot, as unnecessary to the resolution of the case, and as an unnecessary determination of constitutional questions," where the jail policy was no longer in place.   *Id*. at 1028 (summary); *see also id*. at 1027-28 (analysis).

Next, as to the second question on which the plaintiffs sought summary judgment, I determined,

> [T]he proper questions for purposes of determining qualified
> immunity in this case are whether it was clearly established
> that a misdemeanor arrestee has a constitutional right under
> the Fourth Amendment not to be strip searched *in the
> absence of reasonable suspicion* and whether the officers
> conducted the strip searches of these arrestees *without
> reasonable suspicion*, thus violating their constitutional
> rights.

*Rattray*, 754 F. Supp. 2d at 1028-29 (emphasis added).   I then addressed those questions in turn.

As to the first of these dispositive questions, I found as follows:

> [A]t the time of the strip searches at issue here, it was
> clearly established that a strip search without reasonable
> suspicion violates a misdemeanor arrestee's constitutional
> rights. *See Jones v. Edwards*, 770 F.2d 739, 741–42 (8th
> Cir. 1985) (finding a strip search of an arrestee violated the
> Fourth Amendment where authorities had no reasonable
> suspicion of concealed weapons or contraband); *see also
> Smook v. Minnehaha County*, 457 F.3d 806, 813 (8th Cir.
> 2006) ("Our court, like many others, had concluded that a
> strip search of adult offenders without individualized
> suspicion was unreasonable, but those cases did not consider

14

> the different interests involved when the State has
> responsibility to act in loco parentis [as to juvenile
> offenders]."). The only authority to the contrary offered by
> the defendants is *Powell v. Barrett*, 541 F.3d 1298 (11th
> Cir. 2008), but that decision is both not controlling, because
> it is out-of-circuit, and after the fact, as it was handed down
> after the Department had already changed its policy to
> require reasonable suspicion for strip searches, so it could
> not have caused any confusion about the constitutionality of
> the defendants' conduct

*Rattray*, 754 F. Supp. 2d at 1029. Therefore, I concluded that the plaintiffs were entitled to summary judgment on the first question, whether it was clearly established that a misdemeanor arrestee has a constitutional right under the Fourth Amendment not to be strip searched *in the absence of reasonable suspicion*.

I considered the second question separately as to Rattray, on the one hand, and Lambert and Mathes, on the other. *See id.* at 1029-32. I concluded "that the defendants ha[d] failed to generate any genuine issues of material fact that the strip search of plaintiff Rattray could have been justified, *post hoc*, by reasonable suspicion." *Id.* at 1029. More specifically, I concluded,

> [T]he defendants ha[d] made no showing, even *post hoc*,
> that officials responsible for strip searching plaintiff Rattray
> based (or could have based) the strip search on specific
> objective facts and rational inferences that they were entitled
> to draw *from the facts known to them*, in light of their
> experience, to establish the required individualized,
> reasonable suspicion specifically directed to plaintiff
> Rattray. *McDonell [v. Hunter]*, 809 F.2d [1302,] 1307 [(8th
> Cir. 1987)]. Although the officers may be entitled to show
> that they *could have* based a strip search on reasonable
> suspicion, logically, such reasonable suspicion would have
> to be based on what the officers *did* know at the time of the
> strip search, not what they *could have* known, but did not.

*Rattray*, 754 F. Supp. 2d at 1030 (emphasis in the original).  Moreover, I concluded that Rattray was not only entitled to summary judgment that the individual defendants did not have qualified immunity, but on her claim "that the defendants violated her Fourth Amendment right to be free from a strip search in the absence of reasonable suspicion." *Id.* at 1030.  These conclusions meant that "the only remaining issue as to plaintiff Rattray's claims pertains to what, if any, damages she is entitled to receive for the violation of her constitutional rights." *Id.* at 1031.

In short, the only question of violation of Fourth Amendment rights that I addressed on summary judgment was whether a misdemeanor arrestee's Fourth Amendment rights are violated by a strip search *not based on reasonable suspicion*.  I did not address any claim that an otherwise constitutionally permissible strip search— that is, one based on reasonable suspicion—could be conducted in a *manner* that would nevertheless violate a detainee's Fourth Amendment right to be free from unreasonable searches.[3]  I also based my conclusion that a strip search of a misdemeanor arrestee without reasonable suspicion violated the Fourth Amendment on then-controlling Eighth Circuit precedent, specifically, *Jones*, 770 F.3d at 741-42, which stated a blanket rule that a strip search of an adult detainee requires reasonable suspicion.

### b.   The decision in **Florence**

Next, I must determine whether *Florence* is an intervening change in the law— that is, whether it is an intervening controlling decision that actually changes the law in a way applicable to Rattray's case—such that I should reconsider my summary judgment ruling on Rattray's claim pursuant to Rule 54(b).  *See, supra*, at 11.  As

---

[3] Indeed, in light of the conclusion that the strip search of Rattray violated her constitutional rights because it was conducted without reasonable suspicion, I concluded that evidence of the *manner* in which her strip search was conducted went to her damages for the unconstitutional search, not to liability for an unconstitutional search. *See, e.g.,* December 21, 2010, Letter To Counsel Re:  Proposed Jury Instructions.

indicated above, at the time of my ruling on Rattray's motion for summary judgment, controlling circuit precedent held that a strip search of an adult offender without individualized, reasonable suspicion that the arrestee was concealing weapons or contraband was unreasonable and violated the Fourth Amendment.  *See Rattray*, 754 F. Supp. 2d at 1029 (citing *Jones*, 770 F.2d at 741–42, and *Smook*, 457 F.3d at 813).  It is clear to me that *Florence* overruled this circuit's complete prohibition on strip searches of adult arrestees without reasonable suspicion.

In my view, Rattray—and to a lesser degree, the County—has failed to differentiate the extent to which the *Florence* decision *changed the law* from the extent to which it *changed relevant factual considerations* to determine whether an unconstitutional strip search occurred in a specific instance.  To put it another way, Rattray, in particular, has mistaken the *fact-specific holding* in *Florence* for a statement of the *rule* established in *Florence*.  I will attempt to demonstrate the difference between *changing the law* and *changing relevant factual considerations* in my explanation of the *Florence* decision.

In *Florence*, the Court specifically explained the meaning of "strip search" as it was used in the opinion:

> The opinions in earlier proceedings, the briefs on file, and some cases of this Court refer to a "strip search."  The term is imprecise.  It may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position.  *In the instant case, the term does not include any touching of unclothed areas by the inspecting officer*.  There

17

> are no allegations that the detainees here were touched in
> any way as part of the searches.

*Florence*, 132 S. Ct. at 1515 (emphasis added) (subsequently describing the kind of search procedures addressed in the opinion as "visual search procedures"); *id.* at 1520 (noting that the petitioner acknowledged "that corrections officials must be allowed to conduct an effective search during the intake process and that this will require at least some detainees to lift their genitals or cough in a squatting position").   The separate opinions of the justices in the majority all appear to adhere to this definition of the kind of "strip search" at issue.   *See id.* at 1522-23 (Kennedy, J., writing for a plurality) (distinguishing the "types of searches at issue here" from more "invasive" searches); *id.* at 1524 (Alito, J., concurring) (describing the strip searches to which the Court's ruling applied as involving "visual inspection" of nude detainees, during which "the arrestees may be required to manipulate their bodies").   Thus, it is clear that, whatever the scope of the rule in *Florence* may be, it does not address the reasonableness of a strip search of detainees that involves "any touching of unclothed areas by the inspecting officer."

The plaintiffs here are correct that, in *Florence*, the Court "proceed[ed] on the understanding that the officers searched detainees prior to their admission to the general population."   132 S. Ct. at 1515; *see also id.* at 1513 (noting that, "in broad terms, the controversy concerns whether every detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed"); *id.* at 1515 (noting, "The Federal Courts of Appeals have come to differing conclusions as to whether the Fourth Amendment requires correctional officials to exempt some detainees who will be admitted to a jail's general population from the searches at issue [visual body inspections while undressed]").   However, whether detainees to be admitted to the general population could be strip searched without reasonable suspicion

was not how the Court ultimately framed either the split in the circuits that it was called upon to resolve or the specific question before it.

Rather, the Court ultimately framed the split in the circuits as follows:

> *Atwater [v. Lago Vista*, 532 U.S. 318 (2001),] did not address whether the Constitution imposes special restrictions on the searches of *offenders suspected of committing minor offenses once they are taken to jail*.  Some Federal Courts of Appeals have held that corrections officials may not conduct a strip search of *these detainees* [*i.e.*, offenders suspected of committing minor offenses once they are taken to jail], even if no touching is involved, absent reasonable suspicion of concealed contraband.   621 F.3d, at 303–304, and n. 4. The Courts of Appeals to address this issue in the last decade, however, have come to the opposite conclusion. See 621 F.3d 296 (case below); *Bame v. Dillard*, 637 F.3d 380 (C.A.D.C.2011); *Powell [v. Barrett*, 541 F.3d 1298 (11th Cir. 2008)]; *Bull [v. City and Cnty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010)].

*Florence*, 132 S. Ct. at 1518 (emphasis added).  Thus, the Court identified the split without reference to whether or not the arrestees were to be admitted to "general population," but only with reference to the severity of their offenses.   Among the decisions identified by the Third Circuit Court of Appeals in the decision below as holding that correctional officials may not conduct a strip search of detainees held on minor offenses absent reasonable suspicion was the decision of the Eighth Circuit Court of Appeals in *Jones*, 770 F.2d at 741–42, on which I had relied in granting summary judgment in favor of Rattray.  *See Florence*, 621 F.3d at 304 n.4.

Not only did the Court identify the split in the circuits without reference to whether or not the arrestees were to be admitted to general population, but the Court explained that "[t]he current case is set against this precedent and governed by the principles announced in *Turner [v. Safley*, 482 U.S. 78 (1987),] and *Bell [v. Wolfish*, 441 U.S. 520 (1979)]."   *Florence*, 132 S. Ct. at 1518.   The Court had previously

explained that *Turner*, *Bell*, and other precedents, including *Block v. Rutherford*, 468 U.S. 576 (1984), "establish that correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Id.* at 1517. Consequently, the Court explained,

> The question here is whether undoubted security imperatives involved in jail supervision override the assertion that *some detainees* must be exempt from the more invasive search procedures at issue [*i.e.*, strip searches not involving touching by inspecting officers] absent reasonable suspicion of a concealed weapon or other contraband.

*Florence*, 132 S. Ct. at 1518 (emphasis added). Again, whether or not the detainees would be admitted to general population did not figure in the Court's framing of the question. Rather, the question framed by the Court was whether strip searches of *some detainees*, identified as those suspected of committing minor offenses who were taken to jail, required reasonable suspicion. Indeed, Chief Justice Roberts pointed out in his concurring opinion that "before this Court Florence challenged suspicionless strip searches 'no matter what the circumstances.'" *Id.* at 1523 (Roberts, C.J., concurring) (citing Pet. for Cert. i.).

Having framed the question in this way, the Court then determined the appropriate standard to answer it, in light of *Turner*, *Bell*, and *Block*:

> The Court has held that deference must be given to the officials in charge of the jail unless there is "substantial evidence" demonstrating their response to the situation is exaggerated. *Block*, 468 U.S., at 584–585, 104 S.Ct. 3227 (internal quotation marks omitted).

*Florence*, 132 S. Ct. at 1518. The Court concluded that "[p]etitioner has not met this standard, and the record provides full justifications for the procedures used." *Id.*

More specifically, the Court found that "[c]orrectional officials have a significant interest in conducting a thorough search as a standard part of the intake

process," in order to detect lice or contagious infections, wounds or other injuries, gang affiliation, and contraband, including drugs and weapons, but also including unauthorized items that might become objects of trade or that could be used as weapons or to make weapons. *Id.* at 1518-20. The Court concluded,

> It is not surprising that correctional officials have sought to perform thorough searches at intake for disease, gang affiliation, and contraband. Jails are often crowded, unsanitary, and dangerous places. There is a substantial interest in preventing any new inmate, either of his own will or as a result of coercion, from putting all who live or work at these institutions at even greater risk when he is admitted to the general population.

*Florence*, 132 S. Ct. at 1520.

Next, the Court rejected the petitioner's argument that "there is little benefit to conducting these more invasive steps [such as a strip search] on a new detainee who has not been arrested for a serious crime or for any offense involving a weapon or drugs," and that such detainees "should be exempt from this process unless they give officers a particular reason to suspect them of hiding contraband." *Id.* Notable by its absence is any reference in this argument for an exemption to any detainees who would not be admitted to "general population." The Court concluded that it was reasonable for jail officials to conclude that such an exemption would be "unworkable," that "the seriousness of the offense is a poor predictor of who has contraband and that it would be difficult in practice to determine whether individual detainees fall within the proposed exemption." *Id.*; *see also id.* 1520-22 (explaining why this is so). After detailed consideration, the Court concluded, "The restrictions suggested by petitioner would limit the intrusion on the privacy of some detainees but at the risk of increased danger to everyone in the facility, including the less serious offenders themselves." *Id.* at 1522.

21

Ultimately, the Court concluded that, assuming all facts in favor of the petitioner, the search procedures at issue "struck a reasonable balance between inmate privacy and the needs of the institutions" and that "[t]he Fourth and Fourteenth Amendments do not require adoption of the framework of rules petitioner proposes." *Id*. at 1523.

In their dispute about the impact of the *Florence* decision, the parties here have focused a great deal of attention on the various opinions offered by justices making up the majority. In *Florence*, Justice Kennedy wrote for a 5-4 majority of the Court; Justice Scalia joined in Justice Kennedy's opinion in its entirety; Justice Thomas joined in all but Part IV of Justice Kennedy's opinion; Chief Justice Roberts and Justice Alito each wrote separate concurring opinions, but joined in Justice Kennedy's opinion in its entirety; and Justice Breyer wrote a dissent joined in by Justices Ginsburg, Sotomayor, and Kagan.

In Part IV, Justice Kennedy, writing for a plurality, opined, "This case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held *without assignment to the general jail population and without substantial contact with other detainees*," and that "[t]he accommodations provided in these situations may diminish the need to conduct some aspects of the searches at issue." *Id*. at 1522-23 (Kennedy, J., for a plurality). Justice Kennedy also asserted,

> The circumstances before the Court, however, do not present the opportunity to consider a narrow exception of the sort Justice ALITO describes, *post*, at 1524–1525 (concurring opinion), which might restrict whether an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population, may be subjected to the types of searches at issue here.

*Florence*, 132 S. Ct. at 1523 (Kennedy, J., for a plurality).  Finally, Justice Kennedy concluded that circumstances identified by the *amici*, involving intentionally humiliating and abusive practices or touching, "are not implicated on the facts of this case . . . and it is unnecessary to consider them here." *Id.*

Chief Justice Roberts joined in the majority opinion, but stated that "it is important to me that the Court does not foreclose the possibility of an exception to the rule it announces." *Id.* (Roberts, C.J., concurring).  He explained, "The Court makes a persuasive case for the general applicability of the rule it announces.  The Court is nonetheless wise to leave open the possibility of exceptions, to ensure that we not embarrass the future." *Id.* (internal quotation marks and citation omitted).  Justice Alito concurred, "but emphasize[d] the limits of [the Court's] holding." *Id.* at 1524 (Alito, J., concurring).  In his view, the Court held only "that jail administrators may require all arrestees *who are committed to the general population of a jail* to undergo visual strip searches not involving physical contact by corrections officers." *Id.* (emphasis in the original).  As Justice Kennedy indicated, Justice Alito asserted that the Court was not holding that "it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population." *Id.* (emphasis in the original); *see also id.* at 1525 ("The Court does not address whether it is always reasonable, without regard to the offense or the reason for detention, to strip search an arrestee before the arrestee's detention has been reviewed by a judicial officer.").

***c.***     ***The effect of* Florence *on the controlling legal rule***

Considering the separate opinions in *Florence* by Justice Kennedy and the concurring justices, it is clear that the Court did *not* hold that a strip search of a detainee *never* requires reasonable suspicion.  *See id.* at 1524 (Alito, J., concurring) ("It is important to note, however, that the Court does not hold that it is *always*

23

reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population." (emphasis in the original)); *id.* at 1525 ("The Court does not address whether it is always reasonable, without regard to the offense or the reason for detention, to strip search an arrestee before the arrestee's detention has been reviewed by a judicial officer."). Nevertheless, it is also clear that the Court overruled those decisions holding that a strip search of an adult detainee *always* requires reasonable suspicion, such as the Eighth Circuit decision in *Jones* on which I relied in my ruling on Rattray's summary judgment motion. This is so, because the Court framed the question as "whether undoubted security imperatives involved in jail supervision override the assertion that some detainees must be exempt from the more invasive search procedures at issue *absent reasonable suspicion* of a concealed weapon or other contraband," and answered that question yes, thereby establishing a general rule that reasonable suspicion is *not* required to strip search detainees, but acknowledging the possibility of exceptions. *Id.* at 1518 (Kennedy, J., for the majority) (emphasis added). Indeed, Justice Kennedy acknowledged the possibility of "exceptions," but explained that he did not believe that the circumstances permitted the Court to consider the "narrow exception" suggested by Justice Alito. *Id.* at 1522-23. Similarly, Chief Justice Roberts referred to both the "general applicability of the rule" and the Court's acknowledgment of possible "exceptions." *See id.* at 1523 (Roberts, C.J., concurring).

This is the *rule* and the *change in the law* wrought by the *Florence* decision: Reasonable suspicion is *not* required to strip search detainees, subject to possible, but as-yet not fully defined, exceptions.[4]

---

[4] The Eighth Circuit Court of Appeals has not yet determined the impact of *Florence* on its prior decision in *Jones* or otherwise addressed the impact of *Florence* on searches of detainees *without* reasonable suspicion, although it did apply the

*Florence* standards, based on *Turner* and *Bell*, in determining the reasonableness of a policy that *required* reasonable suspicion to strip search sexual offenders civilly committed in Minnesota before and after they left the incarceration unit's secured perimeter and after contact visits. *See Beaulieu v. Ludeman*, 690 F.3d 1017, 1027-30 (8th Cir. 2012). In an unpublished decision, offering no analysis on the question, the Sixth Circuit Court of Appeals opined that "[*Florence*] held that the reasonable suspicion requirement did not apply because of the 'single fact' that a defendant would be incarcerated with others, [but] does not otherwise alter the holding that clearly established law precludes a strip search without reasonable suspicion of persons arrested of a minor offense, 'who are [not] to be held in jail [or other detention facilities] while their cases are being processed.'" *United States v. Morris*, Nos. 10–5507, 10–5633, 2012 WL 3519006, *7 (6th Cir. Aug. 16, 2012) (slip op.). Other federal Circuit Courts of Appeals citing *Florence* have not determined whether *Florence* states the general rule that I believe it states or only the narrow exception that the plaintiffs believe it states. *See, e.g., United States v. Freeman*, 691 F.3d 893, 901 n.1 (7th Cir. 2012) (observing that "*Florence* may require reconsideration of some aspects of our circuit's caselaw, but there is no need to do so here; the strip search in this case was well-supported by particularized suspicion."); *Yourke v. Cnty. & City of San Francisco*, 473 Fed. Appx. 725, 726 (9th Cir. 2012) (memorandum op.) (citing *Florence* and concluding that the district court properly granted summary judgment on the detainee's claim that his strip search was unreasonable).

At least one other federal district court has read *Florence*, as I do, as overruling its circuit's precedent holding that reasonable suspicion is always required to strip search detainees on minor offenses. *See, e.g., Wamble v. County of Jones*, No. 2:09cv103KS-MTP, 2012 WL 2088820, *13 (S.D. Miss. June 8, 2012) (slip op.) (Starrett, J.) ("Importantly, the Court's decision in *Florence* overruled Fifth Circuit precedent requiring reasonable suspicion of contraband and/or weapons for strip-searches of minor-offense arrestees. *See, e.g., Kelly v. Foti*, 77 F.3d 819, 821 (5th Cir. 1996) ('Jail officials may strip search a person arrested for a minor offense and detained pending the posting of bond only if they possess a reasonable suspicion that he is hiding weapons or contraband.'); *Stewart v. Lubbock County*, 767 F.2d 153, 156–57 (5th Cir. 1985) ('Because Lubbock County's strip search policy was applied to minor offenders awaiting bond when no reasonable suspicion existed that they as a category of offenders or individually might possess weapons or contraband, . . . we find such searches unreasonable and the policy to be in violation of the Fourth Amendment.').").

Another district court summarized *Florence* as follows:

Rattray asserts, to the contrary, that the *only* circumstance in which *Florence* holds that reasonable suspicion for a strip search of a detainee is not required is where the detainee is committed to the "general population" of a jail, but that circuit precedent holding that reasonable suspicion is required for a strip search applies in every other context. Rattray is right about the limits of the *holding* in *Florence*, but she is wrong about the limits of the *rule* stated in *Florence*.

---

> Although *Florence* left many questions unanswered, one thing is plain—that is, that a minimum of five Justices (Alito and the four dissenters) did not endorse a blanket rule that all persons may be strip searched after they are arrested. In addition, except for Justice Thomas, the Supreme Court appears to be receptive to an exception to a blanket strip search policy that applies to all arrestees. Although the exception to the *Florence* holding has not been defined, at a minimum it appears to include a situation where a person was arrested for a "minor" offense, she/he was not admitted to the general population, and there was no reasonable suspicion she/he was carrying contraband.

*Haas v. Burlington Cnty.*, Civil No. 08–1102 (NLH/JS), 2012 WL 5497941, *1 (D.N.J. Nov. 13, 2012) (slip op.) (Schneider, Magistrate Judge). That court found, on a motion to dismiss, "that the facts as alleged by plaintiffs plausibly place them within the orbit of an exception to a blanket strip search policy that the majority of the Supreme Court appears ready to accept." *Id.* at 4. Thus, this decision also reads *Florence* as appearing to establish a "blanket rule" subject to exceptions. *See also Waddleton v. Jackson*, C.A. No. C–10–267, 2012 WL 5289779, *7 (S. D. Tex. Oct. 3, 2012) (slip op.) ("[I]f *Florence* holds that a *detainee* can be subjected to a strip search and visual cavity inspection based on his entering the prison system and the mere threat of potential hidden contraband, it follows that a convicted prisoner can also be strip searched and subjected to a visual cavity inspection in an effort to detect and curtail contraband smuggling throughout the prison." (emphasis in the original)).

Justice Alito, whose vote was necessary to establish a majority of the Court, did "emphasize the limits of [the Court's] holding," which, in his view, was only "that jail administrators may require all arrestees *who are committed to the general population of a jail* to undergo visual strip searches not involving physical contact by corrections officers," but that the Court's holding did not address, for example, what was required to strip search "arrestee[s] whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population." *Id.* at 1524 (emphasis in the original). This holding addressed the only *factual* circumstance then before the Court. Similarly, both of the other opinions by justices in the majority recognized that there might be *factual* circumstances in which a strip search without reasonable suspicion would not be reasonable. *See id.* at 1522-23 (Kennedy, J., Part IV, writing for a plurality) (identifying circumstances that might require reasonable suspicion as instances where "a detainee will be held without assignment to the general jail population and without substantial contact with other detainees"); *id.* at 1523 (Roberts, C.J., concurring) (noting that it was important to him that the Court did not foreclose "exceptions" involving circumstances different from Florence's, which were that Florence "was detained not for a minor traffic offense but instead pursuant to a warrant for his arrest, and that there was apparently no alternative, if Florence were to be detained, to holding him in the general jail population").

However, these *factual* circumstances were recognized in the opinions of justices in the majority as *possible exceptions* to a general rule that reasonable suspicion *ordinarily* is not required before a strip search of an adult detainee. *See id.* at 1523 (Kennedy, J., Part IV, writing for a plurality) (concluding that the circumstances before the Court did not present the opportunity to consider a "narrow exception" in which reasonable suspicion would be required or a strip search would otherwise be unreasonable of the sort Justice Alito suggested); *id.* at 1523 (Roberts, C.J.,

concurring) (noting, "The Court makes a persuasive case for the general applicability of the rule it announces.  The Court is nonetheless wise to leave open the possibility of exceptions . . . ."); *id.* at 1524 (Alito, J., concurring) (proposing an exception). Finally, the only part of Justice Kennedy's opinion that Justice Thomas—whose vote was also necessary to establish a majority—did *not* join was Part IV, which contemplated the possibility of exceptions, so that it appears that he saw no need for any exception to a general rule that reasonable suspicion is not required to strip search *any* detainee.

Thus, the *rule* stated in *Florence* was a general one that adult detainees may be strip searched without reasonable suspicion, *subject to exceptions not as-yet fully defined by the Court*.  *Id.* at 1522-23 (Kennedy, J., writing for a plurality) (noting in Part IV that the case before the Court did not permit the Court to define the "narrow exception of the sort Justice ALITO describes"); *id.* at 1523 (Roberts, C.J., concurring) (recognizing that the Court's opinion supported a "general rule" that reasonable suspicion is not required to strip search adult detainees, but that the Court had left open the possibility of undefined "exceptions"); *id.* at 1524-25 (Alito, J., concurring) (describing some circumstances in which the general rule that reasonable suspicion is not required for a strip search might not apply).  Justice Alito's concurrence does not define the limits of the *rule* in the case where Justice Alito stated that he "join[ed] the opinion of the Court in full," including Part IV, *because* the opinion by Justice Kennedy did not foreclose exceptions.  *Id.* at 1525 (noting that Justice Kennedy's opinion "did not address whether it is always reasonable, without regard to the offense or the reason for detention, to strip search an arrestee before the arrestee's detention had been reviewed by a judicial officer," and, instead, "explicitly reserves judgment on that question").

Rattray also asserts that *Florence* is "inapplicable" because there is purportedly no dispute that at no time was she a detainee who would be admitted to "general population" of the jail, that she was never required to share a holding cell, and that she did not have "substantial contact" with other detainees.[5]   Again, these attempts to distinguish *Florence* factually are unavailing, as to the question of whether *Florence* is an intervening change in the law, where *Florence* overruled a circuit *legal* rule that adult detainees cannot be searched without reasonable suspicion, regardless of the circumstances.

Because *Florence* overruled controlling circuit precedent on which I relied in my ruling granting summary judgment in Rattray's favor, on precisely the ground on which I relied on that controlling circuit precedent, it is undoubtedly an intervening change in the law that justifies reconsideration—and, indeed, withdrawal—of my grant of summary judgment in Rattray's favor, because it is no longer equitable for that ruling to stand. *See, supra*, at 11.

### B.    Consideration Of Summary Judgment In The County's Favor

Because I will withdraw my interlocutory grant of summary judgment in Rattray's favor on her "no reasonable suspicion" strip-search claim, in light of *Florence*, I turn to consideration of whether the County is entitled to summary judgment in its favor on any of the plaintiffs' strip-search claims.   It is here that the parties' specific factual disputes about the circumstances under which each plaintiff was

_____

[5] Contrary to Rattray's argument, the County does specifically dispute whether Rattray had substantial contact with other detainees.  I will address that dispute, below, in my consideration of the part of the County's Motion seeking summary judgment in its favor on Rattray's "no reasonable suspicion" strip-search claim.

strip searched and detained after her arrest, viewed in light of *Florence*, become relevant and potentially dispositive.

### 1.    *Arguments of the parties*

The County argues that, like the petitioner in *Florence*, the plaintiffs here cannot show that the County's strip search of misdemeanor detainees without reasonable suspicion was an unnecessary or unjustified response to problems of jail security.  The County argues that the same factors that the Supreme Court found dispositive are equally applicable to the County Jail, because the same concerns with detection of lice and contagious diseases, contraband, wounds or injuries, and gang tattoos, are present even when a detainee is not introduced into "general population," but does have "substantial contact" with others or the *potential* to have "substantial contact" with others.  The County points to the possibility that even detainees who will not be put in "general population" during the first twenty-four hours of their detention may still be "doubled up" in detention cells and shackled with others to be transported to court. Because of the possibility of shared confinement in temporary holding cells and close proximity with other detainees during transport to court, amounting to "substantial contact" with one another, the County argues that it is imperative that all detainees at the County Jail who have been charged with a serious misdemeanor or above be subject to strip searches.  The County argues that its search procedures, like those at issue in *Florence*, struck a reasonable balance between inmate privacy and institutional needs. Moreover, the County points out, there is no dispute that Rattray and Mathes were both shackled with several other detainees to be transported to court, that Lambert now admits that she shared a holding cell with other detainees during the night, and that a small knife was found in Lambert's possession when she was booked. The County also argues that neither Lambert nor Mathes have stated that they were mistreated during

their strip searches in such a way that their strip searches were conducted in an unconstitutional "manner."

The plaintiffs argue that an extension of the rationale in *Florence* to the temporary detention situation, based on the *potential* that detainees will be housed with others, is simply not warranted.  They argue that this proposed exception to reasonable suspicion searches would negate Fourth Amendment protection against unreasonable searches, because any detainees could be strip searched at any time during their detention, because it is always possible that a detainee will have some contact with another detainee.  Rattray and Mathes point out that at no time during their detentions were they ever placed in a temporary holding cell with another detainee and that, apart from being escorted to court with other detainees, they never interacted with another detainee.  Although Lambert admits that her affidavit discloses that she shared a temporary holding cell with another detainee on two separate occasions during her overnight detention, she argues that this fact is of no consequence, because, like the other two plaintiffs, she was never admitted to the jail's general population.  The plaintiffs argue that the County's reading of *Florence* would create an all-encompassing rule of general applicability that reasonable suspicion is not required, but a plurality of the Court was not willing to take that step on the facts before them.  The plaintiffs also contend that some of the evidence on which the County relies to show that detainees may be "doubled up" in detention cells, consisting of the County Jail's "booking logs," cannot be relied on here, because that evidence does not fit into the hearsay exception for records of a regularly conducted business activity in the absence of proper authentication, which they contend is lacking.  Finally, the plaintiffs argue that, even if *Florence* could be read to apply beyond its specific limitation to cases involving detainees admitted to general population, the undisputed facts of this case still demand

summary judgment in their favor, because they suffered indignities far beyond a mere visual body inspection.

In reply, the County argues that the plaintiffs are ignoring the rationale for the decision in *Florence*, which was that the Court should defer to the judgment of correctional officials that security measures are necessary, in the absence of a showing that their response is exaggerated.   The County contends that, as in *Florence*, the exception that the plaintiffs here assert is unmanageable, in light of legitimate security concerns of jail officials and the circumstances of detaining arrestees.   The County admits that none of the plaintiffs were placed in "general population" *per se*, but that the circumstances existed for each of them, as well as any other detainee, to have "substantial contact," in a cell or in the booking area, with other detainees within twenty-four hours of their arrests.   The County points out that, using the analysis from *Florence*, the Eighth Circuit Court of Appeals recently upheld a strip-search policy for civilly committed sex offenders.   The County also argues that Rattray's descriptions of the "manner" of her search are exaggerated and that nowhere do Lambert or Mathes allege that they were touched or abused during the strip-search procedure or that they have a cognizable physical or mental injury from the strip-search procedure.   Finally, the County supplies an affidavit by the sheriff authenticating the jail "booking logs" on which it relies to eliminate the basis for the plaintiffs' challenge to those documents, based on lack of authentication.

### 2.   *Summary judgment standards*

As I have explained, in greater or lesser detail, on numerous occasions, including in the prior ruling on the plaintiffs' summary judgment motions, *see Rattray, Iowa*, 754 F. Supp. 2d at 1026, summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the

moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *see also Torgerson v. City of Rochester*, 643 F.3d 1031, 1042–43 (8th Cir. 2011) (*en banc*) (explaining how the facts are viewed and each party's burden on a motion for summary judgment). Summary judgment is particularly appropriate when only questions of law are involved. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

### 3.   *"No reasonable suspicion" claims*

The County has not sought summary judgment on Rattray's "manner" strip-search claim and assumes that Lambert and Mathes are not making or cannot make "manner" strip-search claims. As I mentioned above, I read Lambert's and Mathes's Resistance to suggest that they believe that they also have both "no reasonable suspicion" and "manner" strip-search claims. For the moment, I will confine my analysis to "no reasonable suspicion" claims.

As the County suggests, *Florence* now specifically requires me to use the following analysis of the plaintiffs' "no reasonable suspicion" strip-search claims involving no touching: I must give deference to the view of the officials in charge of the jail that a strip search was necessary for jail security, in the circumstances presented, unless there is "substantial evidence" demonstrating their response to the situation was exaggerated. *Florence*, 132 S. Ct. at 1518; *see also Beaulieu v. Ludeman*, 690 F.3d 1017, 1027–30 (8th Cir. 2012) (applying this standard from *Florence*, based on *Turner* and *Bell*, in determining the reasonableness of a policy that *required* reasonable suspicion to strip search sexual offenders civilly committed in

33

Minnesota before and after they left the incarceration unit's secured perimeter and after contact visits).[6]  More specifically, the question on the County's Motions For Summary Judgment is whether the plaintiffs have generated genuine issues of material fact, *see* FED. R. CIV. P. 56, that strip searching each of them without reasonable suspicion was an exaggerated response to the situation.  *Florence*, 132 S. Ct. at 1518.

The plaintiffs have not framed their arguments concerning whether or not the County is entitled to summary judgment on their "no reasonable suspicion" strip-search claims in this way, but have, instead, focused on the fact that none of them were admitted to the jail's "general population" and on their attempts to demonstrate that there are genuine issues of material fact as to the extent of any contact that they had with other detainees.  They contend that eliminating a reasonable suspicion requirement to strip search detainees would negate Fourth Amendment protection against unreasonable searches, because any detainee could be strip searched at any time during his or her detention based on possible contact with another detainee.  Similarly, the plaintiffs argue that the County's reading of *Florence* would create an all-encompassing rule of general applicability that reasonable suspicion is not required, but they assert that a plurality of the Court was not willing to take that step on the facts before them.

The central fallacy of the plaintiffs' arguments against summary judgment on their "no reasonable suspicion" strip-search claims, in my view, is that their arguments adhere to the contention, which I rejected above, that *Florence* states only an exception—and a very narrow one at that—to the reasonable suspicion requirement.  For the reasons explained above, however, I read *Florence* to create exactly the general rule that the plaintiffs dispute—that detainees may generally be strip searched without

---

[6] *Beaulieu* is otherwise distinguishable, because that case involved a policy that *required* reasonable suspicion for a strip search, not one that *did not require* reasonable suspicion for a strip search, as is at issue here.  *See Beaulieu*, 690 F.3d at 1027-28.

reasonable suspicion—but the Court also acknowledged the possibility of exceptions in not fully defined *factual* circumstances. Acknowledging the possibility of exceptions maintains Fourth Amendment protection against unreasonable searches. Thus, the question remains whether the plaintiffs have generated genuine issues of material fact, *see* FED. R. CIV. P. 56, that strip searching them at the time of their arrests, without reasonable suspicion, was an exaggerated response to the situation in the County Jail. *Florence*, 132 S. Ct. at 1518. I now believe that summary judgment in favor of the County is appropriate on all of the plaintiffs' "no reasonable suspicion" strip-search claims, in light of this standard from *Florence*.

As in *Florence*, jail officials in this case "have a significant interest in conducting a thorough search as a standard part of the intake process," in order to detect lice or contagious infections, wounds or other injuries, gang affiliation, and contraband, including drugs and weapons, but also including unauthorized items that might become objects of trade or that could be used as weapons or to make weapons. *Id.* at 1518-20. Also, much as in *Florence*, I reject the plaintiffs' argument that detainees who have been arrested only on serious misdemeanor or higher offenses and who will not be put into "general population" *per se* should be exempt from a strip search unless they give officers a particular reason to suspect them of hiding contraband. *Cf. id.* at 1520. As the Court concluded in *Florence*, it was reasonable for jail officials to conclude that such an exemption would be "unworkable," that "the seriousness of the offense is a poor predictor of who has contraband," and "that it would be difficult in practice to determine whether individual detainees fall within the proposed exemption." *Id.*; *see also id.* 1520-22 (explaining why this is so).

What makes this so here is the now undisputed (or undisputable), authenticated evidence from the County Jail's "booking logs" that even detainees initially held alone in separate temporary holding cells, away from the jail's "general population," (1) may

nevertheless be "doubled up" in light of the limited number of temporary holding cells—which undisputedly occurred in Lambert's case—for example, because of the varying volume of arrests and the limited number of temporary holding cells, and (2) may be shackled with other detainees for transportation to court—which undisputedly occurred in Rattray's and Mathes's cases—even before the expiration of their twenty-four hour exclusion from "general population." These circumstances are reasonably likely to involve the "substantial" contact with other detainees that concerned the Court in *Florence*. *See* 132 F.3d at 1518-20.

Although the plaintiffs complain that the County is relying only on "potential" contact with other detainees, it is also reasonable to conclude that it is "unworkable," *cf. id.* at 1520-22, to use a "wait and see" approach to see if detainees actually have contact with others before strip searching them. Such a "wait and see" approach would require jail officials to strip search detainees only when detainees actually had to be "doubled up" or only when detainees actually had to be shackled with others for transportation to court. Thus, such a "wait and see" procedure would impose the extra burden of conducting strip searches of detainees "doubled up" at precisely the time when the influx of arrestees would already be complicating jail intake procedures, and the strip search of detainees before shackling them together would complicate procedures at precisely the time when several detainees would have to be managed for transportation to court. It also would not prevent detainees from secreting contraband in temporary holding cells during the time that they were alone in those cells. Finally, such a "wait and see" procedure would offer considerably less safety to jail officers, who might have numerous contacts with a detainee who has never been strip searched and, consequently, might be hiding a weapon or something that could be used as a weapon, or who could expose them to infectious disease, and it might require them to intervene in an altercation between detainees not recognized as members of rival gangs.

*See id.* at 1520 ("There is a substantial interest in preventing any new inmate, either of his own will or as a result of coercion, from putting *all who live or work* at these institutions at even greater risk when he is admitted to the general population." (emphasis added)); *id.* at 1524 (Alito, J., concurring) (recognizing that the threats to health and safety arising from failure to permit visual body inspections without reasonable suspicion related to both "detainees and staff").   Where there is a realistic potential that detainees will have substantial contact with other detainees, even if they are not put into the jail's "general population" during the first twenty-four hours of detention, requiring reasonable suspicion before searching all detainees at the County Jail arrested on serious misdemeanor charges or higher "would limit the intrusion on the privacy of some detainees but at the risk of increased danger to everyone in the facility, including the less serious offenders themselves." *Id.* at 1522.   The fact that all three of the plaintiffs had contact with other detainees, either in their holding cells or when they were transported to court, demonstrates that the potential for such contact here was realistic.   Moreover, it is reasonable to assume that not all of the detainees shackled together for their initial court appearance will be released—most likely because some of them will be unable to post bond immediately.   Therefore, some of them may be returned to the jail and placed in "general population."

The plaintiffs have failed to generate a genuine issue of material fact that strip-searching them without reasonable suspicion was an exaggerated response to the situation.   *See id.* at 1518.   Instead, they are trying to pound the square peg of their circumstances into the uncertainly defined, but nevertheless roundish—or perhaps oval or elliptical—hole of the *Florence* exception.   They have generated no evidence that the jail officials reasonably could have kept all detainees separately detained and separately transported at all times during their detention and first trip to court; the record evidence is to the contrary.   *Compare id.* at 1524 (Alito, J., concurring) (noting that it might not

be reasonable to conduct a strip search without reasonable suspicion if a detainee, whose detention has not been reviewed by a judicial officer, can be held in available facilities apart from the general population). Thus, they have failed to generate genuine issues of material fact that their cases fall within the as-yet not fully defined exception, based on *factual* circumstances, to the general rule of *Florence* that reasonable suspicion is not required to strip search detainees.

The strip search of the plaintiffs without reasonable suspicion, to the extent that such a search did not involve touching by an inspecting officer, "struck a reasonable balance between inmate privacy and the needs of the institutions" and, consequently, did not, as a matter of law, violate the Fourth Amendment. *Id.* at 1523. The County is entitled to summary judgment on each plaintiff's "no reasonable suspicion" strip-search claim.

### 4.    *"Manner" claims*

The parties' arguments go beyond the question of whether the County is entitled to summary judgment in its favor on the plaintiffs' "no reasonable suspicion" strip-search claims to whether the County is also entitled to summary judgment on any "manner" strip-search claims. More specifically, the County argues that Rattray's description of the "manner" of her search is exaggerated and that nowhere do Lambert or Mathes allege that they were touched or abused during the strip-search procedure or that they have a cognizable physical or mental injury from the strip-search procedure. The plaintiffs argue that they each suffered indignities beyond a mere visual body inspection.

Only Rattray's original separate Complaint could, perhaps, be construed to plead that she was strip searched in a "manner" that was unreasonable, in violation of the Fourth and Fourteenth Amendments. *See* Complaint (docket no. 2), **Count I** (alleging that she was strip searched pursuant to a policy that was deliberately indifferent to the

rights of persons in her position).  In **Counts I** and **II** of Lambert's original Complaint (Case No. C 08-4008-MWB, docket no. 2), and Mathes's original Complaint (Case No. C 08-4032-MWB, docket no. 2), Lambert and Mathes do not expressly plead that they or putative class members were strip searched in a "manner" that was unreasonable, in violation of the Fourth and Fourteenth Amendments, but they do expressly plead that they and putative class members were searched without reasonable suspicion.  **Counts I** and **II** of the plaintiffs' Amended And Consolidated Class Action Complaint (docket no. 66), track Lambert's and Mathes's original allegations, as they also do not expressly plead, either on behalf of the individual plaintiffs or on behalf of the proposed class, that the strip searches were in a "manner" that was unreasonable, in violation of the Fourth and Fourteenth Amendments; rather, they allege only that the plaintiffs' and the purported class members' rights were violated because they were strip searched without reasonable suspicion.  More importantly, in the context of summary judgment motions, I do not believe that, even now, all of the plaintiffs have pointed to sufficient evidence to generate genuine issues of material fact on their "manner" strip-search claims.  Because there are differences among the plaintiffs' "manner" claims, I will consider each plaintiff's "manner" claim in turn.  The parties do not contend that *Florence* is controlling on a "manner" claim, although I conclude that *Florence* does state the applicable analytical standard.

### a.    *Rattray's "manner" claim*

In the Amended And Consolidated Class Action Complaint, Rattray did allege a *factual basis* for a "manner" claim, even if she did not plead that *theory*.  Specifically, she alleged that she asked a female jailer to shut an open door to the room where she was strip searched, because she did not want the men outside of the door to see her naked, but the female jailer refused to do so, *see* Amended And Consolidated Class Action Complaint ¶¶ 25-25; that she was mocked by jailers because she was upset when

39

she removed her clothes, *see id.* at ¶¶ 27-28; that she was subjected to touching by inspecting officers during an attempt to locate a string to a tampon that she claimed to be wearing, *see id.* at ¶¶ 29-34; that she was led to her cell without being allowed to put on a jail suit, so that she was "paraded" naked to her cell past men, *see id.* at ¶¶ 35-38; and that she was then subjected to a physically invasive search while naked in her holding cell, *see id.* at ¶¶ 39-40.   Moreover, the County acquiesced in Rattray's assertion of a "manner" strip search claim during her first trial on damages, in which she asserted that improper touching and other improper conduct went to the amount of her damages, and again in its Motion For Partial Summary Judgment, by limiting that Motion to her "no reasonable suspicion" claim.

Rattray has now pointed to evidence, raising factual and credibility questions, from which reasonable jurors could find that she was physically and perhaps forcibly undressed and physically forced to undergo the visual body inspection, as well as physical touching by the inspecting officer; that, while undressed, she was visible to male officers and arrestees in the booking area through a partially open door; that she was subjected to humiliating and mocking comments by a jailer; that, while still undressed, she was walked through the booking lobby to a temporary holding cell in view of male officers and arrestees; and that, in her holding cell, she was again subjected to a search involving physical touching and perhaps an unreasonably invasive and abusive search.   Certainly, *Florence* does not stand for the proposition that a strip search, even one not requiring reasonable suspicion, is reasonable if it was conducted in a manner that exposed the detainee, while undressed, to the view of officers and arrestees of the opposite sex or touching, physical handling, and intentionally humiliating or abusive comments, of the kind that Rattray alleges.   *See, e.g., Florence*, 132 S. Ct. at 1523 (Kennedy, J., writing for a plurality) (observing that a strip search may still violate the Fourth Amendment if conducted in an abusive, intentionally

humiliating, or excessively invasive way).   I concluded, above, at page 18, that, whatever the scope of the rule in *Florence* might be, it does not address the reasonableness of a strip search of detainees that involves "any touching of unclothed areas by the inspecting officer."   In my view, whether or not touching Rattray, in the course of her strip search, can be justified by reasonable suspicion is only a factor going to the reasonableness of that aspect of the search, but the allegation of improper touching is properly considered as part of Rattray's "manner" claim.   Whether or not there was reasonable suspicion for a search is *not* relevant to whether every alleged aspect of her strip search—such as physically and forcibly removing her clothes, subjecting her to humiliating or mocking comments by a jailer, conducting a strip search in such a way that male officers or arrestees could see her while undressed, leading her past male officers and arrestees on the way to her detention cell while still undressed, and conducting a physically invasive or abusive cavity search in her detention cell—was unreasonable.   *See id*.

Thus, Rattray has pointed to record evidence generating genuine issues of material fact from which a rational juror could find that she was injured by the unreasonable "manner" of her strip search.   *Torgerson*, 643 F.3d at 1042-43 (stating the opposing party's burden on a motion for summary judgment).   To the extent that the County's Motion as to Rattray can be read to seek summary judgment on her "manner" claim, that part of the Motion is denied.

### b.    *Mathes's "manner" claim*

Similarly, Mathes alleged a sufficient *factual basis* for a "manner" claim in the Amended And Consolidated Complaint, even if she did not plead that *theory*.   She alleged that she "noticed that the door of the room [where she was strip searched] was ajar and that several men outside of the room sitting in the booking lobby could see inside of the room, either through the window in the door or because of the door being

ajar." *See id.* at ¶ 74.  Thus, the Amended And Consolidated Class Action Complaint alleges both that the room in which Mathes was strip searched had a window and a door that was ajar *and* that there were men in the adjacent room who could see into the room where she was strip searched because of the window and the door that was ajar, so that her "manner" claim is properly before me.

The question of whether Mathes has generated genuine issues of material fact on a "manner" claim is much closer than it was for Rattray.  Merely alleging that she was "traumatized" by the search, *see* Amended And Consolidated Class Action Complaint, ¶ 80, is not enough to raise a Fourth Amendment claim, if the search was otherwise reasonable.  *See Florence*, 132 S. Ct. at 1524 (Alito, J., concurring) ("Undergoing such an inspection is undoubtedly humiliating and deeply offensive to many, but there are reasonable grounds for strip searching arrestees before they are admitted to the general population of a jail.").  However, in Lambert's And Mathes's Statement Of Additional Material Facts In Resistance To Defendant's Motion For Summary Judgment Regarding Plaintiffs Mathes And Lambert (Lambert's and Mathes's Statement Of Additional Facts) (docket no. 182-3), ¶¶ 4-5, and in her affidavit supporting her resistance to summary judgment, Lambert's And Mathes's Appendix (docket no. 182-5), 1, ¶ 4, Mathes has now pointed to evidence supporting her allegations that the door to the room in which she was strip searched was ajar and that several men outside of the room sitting in the booking lobby could see inside of the room, either through the window in the door or because the door was ajar.  Although the County disputes these allegations, there is both a basis in the record for Mathes's allegations and a credibility dispute about their truth that raises a factual dispute from which a rational juror could conclude that the manner of or the circumstances in which Mathes was strip searched were an exaggerated response to the situation.  *Florence*, 132 S. Ct. at 1518.  Certainly, *Florence* does not stand for the proposition that a strip

search, even one not requiring reasonable suspicion, is reasonable if it was conducted in a manner that exposed the detainee, while undressed, to the view of officers and arrestees of the opposite sex, as Mathes alleges. *See, e.g., Florence*, 132 S. Ct. at 1523 (Kennedy, J., writing for a plurality) (observing that a strip search may still violate the Fourth Amendment if conducted in an abusive, intentionally humiliating, or excessively invasive way).

The County is not entitled to summary judgment on Mathes's "manner" strip-search claim.

### c.    *Lambert's "manner" claim*

Lambert alleged in the Amended And Consolidated Class Action Complaint only that the room in which she was strip searched "had small glass windows." *See* Amended and Consolidated Class Action Complaint at ¶ 57.  She then alleged further facts in her affidavit in support of her resistance to summary judgment, specifically, that "[t]he door to the room in which I was searched had windows in it such that people outside of the room in the booking area could see into the room." *See* Lambert's And Mathes's Appendix at 3, ¶ 4.  In her affidavit, however, she fails to allege that there were actually "people outside of the room in the booking area could see into the room" where she was strip searched from the adjacent room.[7]  Thus, Lambert has failed to

---

[7] Lambert's attempt to assert a basis for her "manner" claim comes very late in the litigation.  Her original Complaint (Case No. C 08-4008-MWB docket no. 2), filed January 28, 2008, did not suggest that she was alleging a "manner" claim as well as a "no reasonable suspicion" claim, but only made the same allegation found in the August 18, 2008, Amended And Consolidated Class Action Complaint (docket no. 66) that she was strip searched in a room with small glass windows.  Lambert's Original Complaint, ¶¶ 28-29.  As explained more fully in the next paragraph, Lambert also did not indicate a factual basis for a "manner" claim in her deposition, taken November 10, 2008. Similarly, when the plaintiffs moved for summary judgment in the consolidated action on October 1, 2010, Lambert did not suggest that she had a "manner" claim as well as a "no reasonable suspicion" claim.  *See* Plaintiffs' Motion For Partial Summary

generate genuine issues of material fact that she was subjected to a strip search conducted in an unreasonable "manner," where she neither adequately pleaded nor pointed to evidence from which a rational juror could find that she was injured by the

---

Judgment (docket no. 93). Even after the "manner" of Rattray's strip search became a central issue in her "damages" trial in January 2011, Lambert did nothing to assert a "manner" claim. It was not until Lambert offered the current affidavit, in response to the County's September 28, 2012, Motion For Summary Judgment (docket no. 177), that Lambert feebly made a "manner" claim that, on its face, is not detailed enough for a reasonable juror to find that she suffered an actual injury.

Lambert's affidavit is also faulty, because her statement in her affidavit "that people outside of the room in the booking area could see into the room" is contrary to her deposition testimony. In her deposition, she testified, "There was people in the—behind the windows, the booking windows," but when she was asked, "You don't know if they could see [into the room where you were strip searched]?", she testified, "I don't know," and admitted that no one told her that they saw her. County's Appendix In Support Of Its Motion For Summary Judgment (docket no. 177-8), 27 (Lambert's Deposition at 35:15-20). In her affidavit, in contrast, Lambert suddenly asserts knowledge that someone could see into the room where she was strip searched. The Eighth Circuit Court of Appeals has reiterated, "In *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983), this court held where a party creates an issue of fact by filing an affidavit contradicting earlier testimony in order to avoid summary judgment, the party raises a 'sham issue of fact instead of a genuine one.'" *Lykken v. Brady*, 622 F.3d 925, 933 (8th Cir. 2010). The court in *Lykken* noted some exceptions to the "sham issue of fact" rule. *Id.* (recognizing clarification of the prior testimony or explanation of the deponent's confusion as exceptions). I have recognized others. *See, e.g., Knutson v. AG Processing, Inc.*, No. C01–3015–MWB, 2002 WL 31422858, *11 (N.D. Iowa Oct. 29, 2002) (recognizing as an exception to the *Camfield* rule an affidavit that supplements but does not contradict factual assertions in a prior deposition); *Rowson v. Kawasaki Heavy Indus., Ltd.*, 866 F. Supp. 1221, 1229–31 (N.D. Iowa 1994) (holding that a belated affidavit could be considered where the affiant's memory was recently refreshed by photographs that he had not been shown during the deposition). However, none of these exceptions appears to be applicable here, and the affidavit is, instead, an "unexpected revision" to create a fact issue where none existed before, with no attempt to explain the difference. *See Marathon Ashland Petroleum, L.L.C., v. International Bhd. of Teamsters*, 300 F.3d 945, 951 (8th Cir. 2002).

"manner" of her strip search. *Torgerson*, 643 F.3d at 1042-43 (stating the opposing party's burden on a motion for summary judgment).

The County is entitled to summary judgment on Lambert's "manner" strip-search claim.

### 5.    Summary

The County is entitled to summary judgment in its favor on Rattray's "no reasonable suspicion" strip-search claim, but is not entitled to summary judgment on Rattray's "manner" strip-search claim, alleging that, even if reasonable suspicion was not required, she was strip searched in a manner or in circumstances that made such a search unreasonable.   The County is entitled to summary judgment in its favor on Lambert's and Mathes's "no reasonable suspicion" strip-search claims and on Lambert's "manner" strip-search claim in their entirety.   However, the County is not entitled to summary judgment on Mathes's "manner" strip-search claim.

### C.    Reconsolidation Of Trials

In my summary judgment ruling, I concluded that it was appropriate to sever Rattray's trial on damages, the only part of her claims not resolved by that ruling, from the trial on liability and damages on Lambert's and Mathes's claims, pursuant to Rule 42(a) and (b) of the Federal Rules of Civil Procedure, "'[f]or convenience, to avoid prejudice, or to expedite and economize . . . .'" *See Rattray*, 754 F. Supp. 2d at 1032 (quoting the rule).   Such severance no longer seems appropriate, where both Rattray and Mathes must now try to establish liability and damages on their "manner" strip search claims, and trial of their claims is likely to involve overlapping witnesses and other evidence, so that consolidation is actually more likely than severance to result in considerable economies for the parties and the court. *See* FED. R. CIV. P. 42(a) & (b).

Therefore, the trial on the remaining claims of plaintiffs Rattray and Mathes will be reconsolidated on March 11, 2013, the date that was previously set for the retrial of Rattray's damages claims, and the separate trial on Lambert's and Mathes's claims, set for April 22, 2013, will be cancelled.

### D.      Certification For Interlocutory Appeal

No party has suggested that, whatever my disposition of the County's Motions, I should certify any part of my disposition for interlocutory appeal.   Nevertheless, I believe that it is appropriate to consider doing so.   As the Eighth Circuit Court of Appeals has explained,

> An order dismissing some but not all claims is not final and not immediately appealable. *See, e.g., Reinholdson v. Minnesota*, 346 F.3d 847 (8th Cir. 2003). Such an order may be appealed, however, if certain conditions enumerated in Rule 54(b) or 28 U.S.C. § 1292(b) have been met.

*Mathers v. Wright*, 636 F.3d 396, 398 (8th Cir. 2011).   I will set out, in turn, the standards for certification pursuant to Rule 54(b) and § 1292(b).

### 1.      Certification pursuant to Rule 54(b)

Rule 54(b) of the Federal Rules of Civil Procedure provides as follows:

> **(b) Judgment on Multiple Claims or Involving Multiple Parties.**   When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.   Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be

46

> revised at any time before the entry of a judgment
> adjudicating all the claims and all the parties' rights and
> liabilities.

FED. R. CIV. P. 54(b).  Here, this ruling disposes of all of Lambert's claims, but only some of Rattray's and Mathes's claims, so that it "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties," and, in the absence of a certification for interlocutory appeal, this ruling "does not end the action as to any of the claims or parties." *Id.*

As the Eighth Circuit Court of Appeals recently reiterated, "'Rule 54(b) creates a well-established exception to th[e] rule [that federal appellate courts generally consider only orders that dispose of all claims as final and appealable under 28 U.S.C. § 1291] by allowing a district court to enter a final judgment on some but not all of the claims in a lawsuit." *Williams v. County of Dakota, Neb.*, 687 F.3d 1064, 1067 (8th Cir. 20012) (quoting *Clark v. Baka*, 593 F.3d 712, 714 (8th Cir. 2010) (per curiam), with citations and quotation marks omitted).  In *Williams*, the court reiterated the two-step analysis and standards that the district court must use when deciding whether to grant Rule 54(b) certification:

> [T]he district court may enter final judgment under this rule
> "only if the court expressly determines that there is no just
> reason for delay."  Fed.R.Civ.P. 54(b).  We review the
> court's decision to grant Rule 54(b) certification for an
> abuse of discretion, noting that such interlocutory appeals
> are "generally disfavored" and that "it is only the special
> case that warrants an immediate appeal from a partial
> resolution of the lawsuit."  *Clark*, 593 F.3d at 714–15
> (citations and quotation marks omitted).
>
> . . . The court "'must first determine that it is
> dealing with a final judgment . . . in the sense that it is an
> ultimate disposition of an individual claim.'"  *Outdoor
> Cent.[, Inc. v. GreatLodge.com, Inc.]*, 643 F.3d [1115,]
> 1118 [(8th Cir. 2011) (quoting *Curtiss–Wright Corp. v.*

47

> *Gen. Elec. Co.*, 446 U.S. 1, 7, 100 S.Ct. 1460, 64 L.Ed.2d
> 1 (1980)).  Second, "[i]n determining that there is no just
> reason for delay, the district court must consider both the
> equities of the situation and judicial administrative interests,
> particularly the interest in preventing piecemeal appeals."
> *Id.* (citation and quotation marks omitted).  "Certification
> should be granted only if there exists 'some danger of
> hardship or injustice through delay which would be
> alleviated by immediate appeal.'"  *Hayden v. McDonald*,
> 719 F.2d 266, 268 (8th Cir. 1983) (per curiam) (citation
> omitted).
>
>          Generally, we give substantial deference to the
> district court's decision to certify orders under Rule 54(b) as
> the district court is "'most likely to be familiar with the case
> and with any justifiable reasons for delay.'"  *Clark*, 593
> F.3d at 715 (citation omitted).  However, this deference
> "rests on the assumption that the district court undertook to
> weigh and examine the competing interests involved in a
> certification decision."  *Hayden*, 719 F.2d at 268.

*Williams*, 687 F.3d at 1067-68.  Using this two-step analysis and standards, it appears
to me that certification of this ruling for interlocutory appeal might be appropriate in
this case.

First, this ruling is "a final judgment" in the sense that "it is an ultimate
disposition of an individual claim."  *Id.* at 1067 (internal quotation marks and citations
omitted) (explaining how to determine, in the first step, whether the court is dealing
with a final judgment).  Specifically, it is an ultimate disposition of *all* of plaintiff
Lambert's claims, and Rattray's and Mathes's "no reasonable suspicion" strip-search
claims.  The record on these claims has now been fully developed on motions for
summary judgment by both sides, and I have made what I believe is a dispositive
determination of the impact of *Florence* on the parties' claims.

Second, considering the equities and interests at issue, it appears likely that there
is no just reason for delay.  *Id.* (second step of the analysis).  There appears to be some

danger of hardship or injustice as to plaintiff Lambert through delay of an appeal, as I have granted summary judgment against her on all of her claims in their entirety.  *Id*. Similarly, there appears to be some danger of hardship or injustice as to the other plaintiffs, if I have improvidently granted summary judgment on portions of their claims, based on a misinterpretation of the import of the Supreme Court's recent decision in *Florence*, upon which the Eighth Circuit Court of Appeals has not yet had the opportunity to pass.

More specifically, it is possible that the appellate court could reject my interpretation of *Florence* as stating a general rule that a strip search of a detainee not involving touching by inspecting officers does not require reasonable suspicion, subject to as-yet not fully determined exceptions, and my further determination that these cases do not fit any such exception.   The appellate court might, instead, embrace the plaintiffs' reading of *Florence* as stating only a narrow exception to the general rule that a strip search of a detainee requires reasonable suspicion and that this case does not fit such an exception, but falls within the general rule in which reasonable suspicion is required.  If my interpretation were rejected by the appellate court, then proceeding to trial now on the "manner" claims would be a waste of judicial resources and resources of the parties, because the piecemeal trial of those claims now and another trial later on "no reasonable suspicion" claims after appeal would likely require substantial additional time, preparation, and expense—and involve more jurors.  I believe that this situation could be alleviated, not only by permitting an immediate appeal, but by staying trial of the remaining "manner" claims while an interlocutory appeal proceeds.  I recognize that these consolidated cases have previously been stayed for a substantial period of time.  Nevertheless, it appears that the benefits to be obtained by a complete disposition of all claims in a single further trial, after interlocutory appeal of my grant of summary judgment, in light of my reading of *Florence*, on the "no reasonable suspicion" claims,

outweigh the detriments of delaying trial on the "manner" claims, if there is a possibility that I have improvidently granted summary judgment on "no reasonable suspicion" claims that would then have to go to trial.   Finally, if I did not stay the proceedings pending any appeal, trying remaining "manner" claims now and then trying the "no reasonable suspicion" claims on which I have granted summary judgment after reversal on appeal would mean that Rattray would be required to go through the financial and emotional burden of a *third* trial.

Therefore, I will entertain a motion for entry of judgment pursuant to Rule 54(b) against Lambert on all of her claims and against Rattray and Mathes on their "no reasonable suspicion" claims, and a request to certify those claims for immediate interlocutory appeal, on the ground that there is no just reason for delay of an immediate appeal on those claims.

### 2.   *Certification pursuant to 28 U.S.C. § 1292(b)*

In the alternative or in addition to a request to certify this ruling for interlocutory appeal pursuant to Rule 54(b), I would consider whether any part of this ruling should be certified for immediate interlocutory appeal pursuant to § 1292(b).   As the Eighth Circuit Court of Appeals has explained,

> Under 28 U.S.C. § 1292(b), we may assume jurisdiction over an appeal from an interlocutory order at our discretion if the district court issuing the order is of the opinion that "such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation[.]"

*Mathers*, 636 F.3d at 398.   The district court's certification is not enough to pursue an interlocutory appeal, however; rather, a party seeking interlocutory appeal must make application within ten days after entry of the order.   *Estate of Storm v. Northeast Iowa Hosp. Corp.*, 548 F.3d 686 (8th Cir. 2008) (citing § 1292(b)).   As the appellate court

has also explained, "If a district court grants certification under § 1292(b), the court of appeals may then decide whether to exercise its discretion to permit an immediate appeal." *Langford v. Norris*, 614 F.3d 445, 454 n.6 (8th Cir. 2010).

Certification for interlocutory appeal pursuant to § 1292(b) is "exceptional" and should be made "sparingly and with discrimination," and the burden to show that such certification is appropriate is "heavy." *Union Cnty., Iowa v. Piper Jaffray & Co., Inc.*, 525 F.3d 643, 645-46 (8th Cir. 2008) (internal quotation marks and citations omitted).

> "Section 1292(b) establishes three criteria for certification: the district court must be of the opinion that (1) the order involves a controlling question of law; (2) there is substantial ground for difference of opinion; and (3) certification will materially advance the ultimate termination of the litigation." *[White v. Nix*, 43 F.3d 374,] 377 [(8th Cir. 1994)] (internal quotations omitted). . . . We address each requirement to determine whether the district court abused its discretion in certifying this appeal. *See id.* at 377-79 (finding that the district court abused its discretion in certifying appeal because:   (1) it failed to adequately consider all the relevant criteria before granting the motion for certification and (2) none of the statutory criteria were satisfied).

*Union Cnty.*, 525 F.3d at 646.

Again, it appears that the circumstances of this case would fit the requirements for certification for interlocutory appeal pursuant to § 1292(b).  I believe that this ruling involves a controlling question of law, *id.* (first criterion), specifically, whether *Florence* states a general rule that reasonable suspicion is not required to strip search detainees, subject to as-yet not fully defined exceptions, or only a very narrow exception to the requirement of reasonable suspicion in the case of detainees who will be admitted to "general population."   While I have rejected the plaintiffs'

interpretation, I must acknowledge that their reading of *Florence* is sufficiently plausible to provide substantial ground for a difference of opinion.   *Id.* (second criterion); *see also United States v. Morris*, Nos. 10–5507, 10–5633, 2012 WL 3519006, *7 (6th Cir. Aug. 16, 2012) (slip op.) (opining that "[*Florence*] held that the reasonable suspicion requirement did not apply because of the 'single fact' that a defendant would be incarcerated with others, [but] does not otherwise alter the holding that clearly established law precludes a strip search without reasonable suspicion of persons arrested of a minor offense, 'who are [not] to be held in jail [or other detention facilities] while their cases are being processed.'").   Finally, at least in the absence of arguments from the parties, it appears likely that certification would materially advance the ultimate termination of the litigation, *id.* (third criterion), because a circuit court ruling on the scope of *Florence* would likely finally determine the viability of the plaintiffs' "no reasonable suspicion" claims, permitting all claims to be tried in a single, consolidated, more efficient, and more economical proceeding.

Therefore, in the alternative or in addition to a request to certify this ruling for interlocutory appeal pursuant to Rule 54(b), I will entertain any motion for immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b) of the controlling question of law whether *Florence* states a general rule that reasonable suspicion is not required to strip search detainees, subject to as-yet not fully defined exceptions, or only a very narrow exception to the requirement of reasonable suspicion in the case of detainees who will be admitted to "general population."

## III.   CONCLUSION

Upon the foregoing,

1.      The County's September 28, 2012, Motion To Reconsider Ruling On Rattray's Motion For Partial Summary Judgment And [Its] Motion For Partial

Summary Judgment (docket no. 176) is **granted in part and denied in part**, as follows:

        a.     That part of the Motion seeking partial reconsideration of my December 1, 2010, Memorandum Opinion And Order Regarding Plaintiffs' Motion For Partial Summary Judgment (docket no. 104), *published at Rattray v. Woodbury Cnty., Iowa*, 754 F. Supp. 2d 1023 (N.D. Iowa 2010), is **granted**, and that part of the ruling granting summary judgment in Rattray's favor is **withdrawn**;

        b.     That part of the Motion seeking summary judgment in the County's favor on Rattray's "no reasonable suspicion" strip-search claim is **granted**; but

        c.     To the extent that the Motion can be construed to seek summary judgment on Rattray's "manner" strip-search claim, it is **denied**.

    2.     The County's September 28, 2012, Motion For Summary Judgment Regarding Mathes And Lambert (docket no. 177) is **granted in part and denied in part**, as follows:

        a.     That part of the Motion seeking summary judgment in the County's favor on Lambert's "no reasonable suspicion" strip-search claim and on her "manner" strip-search claim is **granted**;

        b.     That part of the Motion seeking summary judgment in the County's favor on Mathes's "no reasonable suspicion" strip-search claim is **granted**; but

        c.     That part of the Motion seeking summary judgment in the County's favor on Mathes's "manner" strip-search claim is **denied**.

    3.     Trial on Rattray's and Mathes's remaining claims shall be **consolidated**. The current trial date of March 11, 2013, originally set for the retrial of Rattray's damages claims, shall be maintained for the consolidated trial of Rattray's and Mathes's remaining claims, so that a prompt trial date will be available, if no party seeks

certification for interlocutory appeal or if the Eighth Circuit Court of Appeals declines to hear an interlocutory appeal.

4.     The separate trial on Lambert's and Mathes's claims, set for April 22, 2013, is **cancelled.**

5.     I will entertain any **timely** motion for certification for interlocutory appeal, pursuant to either Rule 54(b) or § 1292(b), or both.

**IT IS SO ORDERED**.

**DATED** this 10th day of December, 2012.

_Mark W. Bennett_
_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA